# SUPREME COURT OF THE UNITED STATES

## RAMIN KHORRAMI *v.* ARIZONA

### ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF APPEALS OF ARIZONA, DIVISION ONE

No. 21–1553.   Decided November 7, 2022

The petition for a writ of certiorari is denied.

JUSTICE KAVANAUGH would grant the petition for a writ of certiorari.

JUSTICE GORSUCH, dissenting from the denial of certiorari.

The State of Arizona convicted Ramin Khorrami of serious crimes before an 8-member jury.  On appeal, Mr. Khorrami sought a new trial, arguing that the Sixth and Fourteenth Amendments of the U. S. Constitution guarantee individuals like him a trial before 12 members of the community.  The Arizona Supreme Court rejected the appeal, explaining that it considered itself bound by *Williams* v. *Florida*, 399 U. S. 78 (1970).  There, for the first time and in defiance of centuries of precedent, this Court held that a 12-member panel "is not a necessary ingredient" of the Sixth Amendment right to trial by jury.  *Id.*, at 86.  In his petition for certiorari, Mr. Khorrami asks us to reconsider *Williams*.  Regrettably, the Court today declines to take up that task.  *Williams* was wrong the day it was decided, it remains wrong today, and it impairs both the integrity of the American criminal justice system and the liberties of those who come before our Nation's courts.

\*

Presently, the laws in 44 States entitle individuals charged with serious crimes to a trial before a 12-member jury. Only 6 States, Arizona included, tolerate smaller panels—and it is difficult to reconcile their outlying practices with the Constitution.  The Sixth Amendment protects the

"right to a speedy and public trial, by an impartial jury." And a mountain of evidence suggests that, both at the time of the Amendment's adoption and for most of our Nation's history, the right to a trial by jury for serious criminal offenses *meant* a trial before 12 members of the community—nothing less.

Start with this. We often say that "[t]he interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." *Smith* v. *Alabama*, 124 U. S. 465, 478 (1888). And while scholars may debate the precise moment when the common-law jury came to be fixed at 12 members, this much is certain: By the time of the Sixth Amendment's adoption, the 12-person criminal jury was "an institution with a nearly four-hundred-year-old tradition in England." R. Miller, Comment, Six of One Is Not a Dozen of the Other: A Reexamination of *Williams* v. *Florida* and the Size of State Criminal Juries, 146 U. Pa. L. Rev. 621, 643 (1998) (Miller). In 1769, Blackstone stated the rule succinctly: No person could be found guilty of a serious crime unless "the truth of every accusation [was] confirmed by the unanimous suffrage of twelve of his equals and neighbours." 4 Commentaries on the Laws of England 343. In the 1790s, James Wilson, both a framer of the Constitution and a Justice of this Court, explained the common-law rule this way: "[T]he unanimous sentiment of the twelve jurors is of indispensable necessity" to "the conviction of a crime." Of Juries, in 2 Collected Works of James Wilson 985 (K. Hall & M. Hall eds. 2007).

From the moment it was adopted, the Sixth Amendment was widely understood to protect this ancient right. In the first few decades following the Amendment's ratification, a "flurry" of state courts interpreted the phrase "trial by an impartial jury" to require the use of a 12-person panel. Miller, 643, and n. 133 (collecting cases). A host of state courts

pursued the same understanding through the balance of the 19th century. Pet. for Cert. 11–12 (collecting cases). The third edition of Story's Commentaries on the Constitution likewise stated that "[a] trial by jury *is* . . . a trial by a jury of *twelve*. . . . Any law therefore, dispensing with [this] requisit[e] may be considered unconstitutional." 2 Commentaries on the Constitution of the United States §1779, p. 588, and n. 3 (3d ed. 1858) (second emphasis in original).

Later American treatises echoed the same refrain. One said that a criminal jury means "a body of twelve. . . . Any less than this number of twelve would not be a common-law jury, and not such a jury as the [C]onstitution preserves to accused parties." T. Cooley, Constitutional Limitations 319 (1868). Another observed that "[a] jury of less than twelve . . . is not a jury; and a statute authorizing a jury of less, in a case in which the Constitution guarantees a jury trial, is void." 1 J. Bishop, Criminal Procedure §897, p. 545 (2d ed. 1872). A third taught that, "where the record shows that the cause was tried by a jury of less than twelve men, the trial will be held to be a nullity." S. Thompson & E. Merriam, Organization, Custody and Conduct of Juries §6, p. 6 (1882).

Nor was this view confined to lower courts and commentators. This Court first addressed the question of jury composition in 1898 when it overturned an 8-person verdict from Utah. *Thompson* v. *Utah*, 170 U. S. 343. Speaking for the Court, Justice Harlan could not have been plainer: "[T]he jury referred to in the original Constitution and in the Sixth Amendment is a jury constituted, as it was at common law, of twelve persons, neither more nor less." *Id.*, at 349. In support of his conclusion, Justice Harlan stressed that "the words 'trial by jury' were placed in the Constitution of the United States with reference to the meaning affixed to them in the law as it was in this country and in England at the time of the adoption of that instrument." *Id.*, at 350.

A year later the Court returned to the area adding that a trial by jury "in the primary and usual sense of the term at the common law and in the American constitutions, is . . . a trial by a jury of twelve." *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 13 (1899). A year later still, the Court professed "no doubt" that "a jury composed, as at common law, of twelve jurors was intended by the Sixth Amendment." *Maxwell* v. *Dow*, 176 U. S. 581, 586 (1900). Five years after that, the Court repeated and reaffirmed *Thompson'*s holding that the Sixth Amendment guarantees "'the right to be tried by a jury of twelve.'" *Rassmussen* v. *United States*, 197 U. S. 516, 527 (1905).

By 1930, the Court declared that it was "not open to question" that the right to trial by jury for serious criminal offenses "means a trial by jury as understood and applied at common law," including the element that it "should consist of twelve" members. *Patton* v. *United States*, 281 U. S. 276, 288. Nor was the Court open to even slight deviations from this rule: "To uphold the voluntary reduction of a jury from twelve to eleven upon the ground that the reduction—though it destroys the jury of the Constitution—is only a slight reduction, is not to interpret that instrument, but to disregard it." *Id.*, at 292. In 1968, the Court seemingly acknowledged all this, quoting Blackstone once more for the principle that "'the truth of every accusation'" must be proved to "'twelve of [the accused's] equals and neighbours.'" *Duncan* v. *Louisiana*, 391 U. S. 145, 151–152.

*

Decided against this backdrop, *Williams* was an anomaly the day it issued in 1970. The decision upheld a Florida law permitting the use of 6-member juries in cases involving serious criminal accusations. In doing so, the decision contravened the Sixth Amendment's original meaning and hundreds of years of precedent in both common-law courts and this one. Nor are the three most essential moves *Williams* made to reach its result remotely persuasive.

First, *Williams* sought to sidestep any serious inquiry into the "'intent of the Framers'" of the Sixth Amendment on the ground that their motivations were an "elusive quarry." 399 U. S., at 92. To prove its point, *Williams* observed that James Madison's initial draft guaranteed a jury trial with its "'accustomed requisites,'" but the Senate later dropped this qualifying language. *Id.*, at 94–95. According to the *Williams* majority, Madison's draft surely would have carried with it a guarantee of a 12-member jury, for that was an "accustomed requisite" of criminal trials at common law. *Id.*, at 95–96. But the Senate's editorial change made it at least "plausible" to infer that some Senators may have "intended" to abandon the traditional 12-person rule. *Id.*, at 97.

This argument proves too much. Even *Williams* acknowledged that the bit of drafting history it cited might just as easily support the *opposite* inference it drew. After all, it is equally possible from all we know that Senators omitted the phrase "accustomed requisites" because they understood the right to trial by jury *as* a trial before 12 members of the community and saying anything more risked confusion or surplusage. *Ibid.*; see also *Ramos* v. *Louisiana*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 12). Recognizing this point, we have since explained that, "rather than dwelling on text [the Senate] left on the cutting room floor, we are much better served by interpreting the language Congress retained and the States ratified." *Ramos*, 590 U. S., at \_\_\_ (slip op., at 12). And when it comes to *that* question, the answer is not nearly so elusive. Whatever the private intentions of the Senate editors, plenty of evidence exists about the original public meaning of the Sixth Amendment—and that evidence strongly indicates that the right to criminal trial by jury meant nothing less than a trial before 12 members of the community.

Second, *Williams* not only had to sidestep evidence of original meaning to reach its result, it also had to find some

way around a battery of this Court's precedents stretching
from 1898 to 1968. To accomplish that, *Williams* tersely
dismissed the teachings of all these cases as "dict[a]." 399
U. S., at 91–92. But that move, too, undersells history. As
we've seen, long before *Williams* this Court stated unequiv-
ocally that "the jury referred to in the original Constitution
and in the Sixth Amendment is a jury constituted, as it was
at common law, of twelve persons." *Thompson*, 170 U. S.,
at 349. This Court expressed "no doubt" that the Sixth
Amendment right to a trial by jury means "a jury composed,
as at common law, of twelve." *Maxwell*, 176 U. S., at 586.
The Court did not consider the matter "open to question."
*Patton*, 281 U. S., at 288. To the contrary, the Court said
that even "slight reduction[s]" in the size of juries would not
be consistent with a fair "interpret[ation]" of the Sixth
Amendment but amount to a "disregard [of] it." *Id.*, at 292.
As Justice John Marshall Harlan II highlighted in his sep-
arate writing in *Williams*, this extensive line of decisions
long ago liquidated the meaning of the Sixth Amendment:
"[B]efore today it would have been unthinkable to suggest
that the Sixth Amendment's right to a trial by jury is satis-
fied" by anything less than trial before a panel of 12 mem-
bers. *Id.*, at 122 (Harlan, J., concurring opinion).

Third, after giving short shrift to original meaning and
precedent, *Williams* still had to construct an affirmative
case for permitting 6-member juries. To do so, *Williams*
first posited that the ancient 12-member jury rule "rest[s]
on little more than mystical or superstitious insights." *Id.*,
at 88. Next, *Williams* suggested that 6-member juries
would "probably" function just as well when it comes to en-
suring thoughtful "group deliberation . . . and . . .
provid[ing] a fair possibility for obtaining a representative
cross-section of the community." *Id.*, at 100. Even *Williams*
had to concede, however, that "few experiments" and little
evidence existed to support its claims. *Id.*, at 101. In the

end, the best *Williams* could say was that, as of 1970, "neither currently available evidence nor theory" had yet proved that a 12-person jury "is necessarily more advantageous" than a 6-member panel. *Id.*, at 101–102.

None of this supplies a sound basis for judicial tinkering with an ancient tradition. As the Court in *Patton* wrote almost a century ago, "[i]t is not our province to measure the extent to which the Constitution has been contravened and ignore the violation, if in our opinion, it is not, relatively, as bad as it might have been." 281 U. S., at 292. Or as we put the point more recently: "When the American people chose to enshrine [the jury trial] right in the Constitution, they weren't suggesting fruitful topics for future cost-benefit analyses. They were seeking to ensure that their children's children would enjoy the same hard-won liberty they enjoyed." *Ramos*, 590 U. S., at \_\_\_ (slip op., at 15). "As judges, it is not our role to reassess whether" the same jury-trial right that Americans enjoyed at the founding "is 'important enough' to retain. With humility, we must accept that th[e] right may serve purposes evading our current notice. We are entrusted to preserve and protect that liberty, not balance it away aided by no more than social statistics." *Ibid.*

Even taken on their own terms, *Williams*'s functionalist claims have not aged well. Before the ink dried on the decision, scholars began criticizing *Williams* for overreading the handful of studies it cited to support its tepid assertion that 6-member panels would "probably" operate as well as 12-member juries. See, *e.g.*, H. Zeisel, . . . And Then There Were None: The Diminution of the Federal Jury, 38 U. Chi. L. Rev. 710, 712–715 (1971). And just 8 years later in *Ballew* v. *Georgia*, 435 U. S. 223 (1978), this Court found itself confronted with more "recent empirical data." *Id.*, at 232–33. As *Ballew* acknowledged, this new data *did* suggest that "smaller juries are less likely to foster effective group deliberation," and *did* "raise doubts about the accuracy of the results achieved by . . . smaller panels." *Id.*, at

232–234. As *Ballew* admitted, this new data also suggested that "as juries become smaller" the "variance [redounds] to the detriment of one side, the defense." *Id*., at 236. Smaller juries, too, this new research found, are less likely to include members of "minority groups," and thus threaten to deprive defendants of a fair possibility of obtaining a jury composed of a representative cross-section of the community. *Id.,* at 236–237. While *Ballew* declined to overrule *Williams* outright, it refused to extend the decision to permit the use of 5-member juries—and in the process it effectively undermined the entire functionalist rationale on which *Williams* rested.

An array of studies in the years since *Ballew* has done more of the same. These studies suggest that 12-member juries deliberate longer, recall information better, and pay greater attention to dissenting voices. See, *e.g.*, M. Saks & M. Marti, A Meta-Analysis of the Effects of Jury Size, 21 Law & Hum. Behav. 451, 455–466 (1997). This research continues to suggest that smaller juries are less likely to include minorities. See, *e.g.*, *id*., at 455—457; S. Diamond, et al., Achieving Diversity on the Jury: Jury Size and the Peremptory Challenge, 6 J. Empirical Legal Studies 425, 442 (2009) (summarizing the results of one study: "While 28.1 percent of the six-member juries lacked even one black juror, only 2.1 percent of the 12-member juries were entirely without black representation"). And this research suggests that the absence of minorities can have a striking effect on outcomes. According to one study, "there is a significant gap in conviction rates for black versus white defendants when there are no blacks in the jury pool," while "the gap in conviction rates for black versus white defendants is eliminated" when there is at least one black member of the jury pool. S. Anwar, et al., The Impact of Jury Race in Criminal Trials, 127 Q. J. Econ. 1017, 1019–1020, 1034–1035 (2012); see also S. Sommers & P. Ellsworth, How Much Do We Really Know About Race and Juries? A Review

of Social Science Theory and Research, 78 Chi.-Kent L. Rev. 997, 1028–1029 (2003) (discussing an experiment showing that "White jurors on racially mixed juries were less likely to vote to convict [a] Black defendant than White jurors on all-White juries").

Nor should we need a barrage of statistical studies to tell us this much. During the Jim Crow era, some States restricted the size of juries and abandoned the demand for a unanimous verdict as part of a deliberate and systematic effort to suppress minority voices in public affairs. See, *e.g.*, La. Const., Art. 116 (1898); *Ramos*, 590 U. S., at \_\_\_, (slip op., at 1–3) (observing that the 1898 Louisiana Constitution allowed 5-member juries and nonunanimous verdicts alongside "a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements"); S. C. Const. Art. III, §1 (1865) and 1866 S. C. Sess. Laws 493, §3 (providing for 8-member juries in district courts, which have jurisdiction over "all criminal cases wherein the accused is a person of color"). To be sure, some States have adopted smaller criminal juries for different reasons. Arizona, for example, may have been trying to cut costs when it adopted its law permitting 6-member juries in 1972 shortly after this Court decided *Williams*. See S. Diamond & A. Ryken, The Modern American Jury: A One Hundred Year Journey, 96 Judicature 315, 318 (2013). But the reality that smaller panels tend to skew jury composition and impair the right to a fair trial is no new insight. It is sad truth borne out by hard experience.

\*

For almost all of this Nation's history and centuries before that, the right to trial by jury for serious criminal offenses meant the right to a trial before 12 members of the community. In 1970, this Court abandoned that ancient promise and enshrined in its place bad social science parad-

ing as law.  That mistake continues to undermine the integrity of the Nation's judicial proceedings and deny the American people a liberty their predecessors long and justly considered inviolable.  Today's case presented us with an opportunity to correct the error and admit what we know the law is and has always been.  Respectfully, we should have done just that.