# Procedural Provisions for Imposing the Death Penalty in Pending Legislation

[The following memorandum comments on proposed legislation to bring the federal death penalty provisions into compliance with the constitutional standards identified by the Supreme Court in *Furman* v. *Georgia,* 408 U.S. 238 (1972) and subsequent decisions. It identifies certain procedural provisions as likely to be subject to constitutional challenge, and indicates how the issues involved are likely to be resolved under existing case law. Among the issues discussed are: (1) whether the Constitution's requirement of a unanimous jury extends to the sentencing phase of a capital case; (2) whether the jury's consideration of mitigating factors may be limited; (3) whether evidence of aggravating factors may be admitted regardless of its admissibility under the rules of evidence; (4) whether the language specifying aggravating and mitigating factors is unconstitutionally vague; (5) whether the death penalty may be imposed for non-homicidal crimes; and (6) whether appellate review only at the request of the defendant is an adequate safeguard against the random or arbitrary imposition of the death penalty.]

May 30, 1980

## MEMORANDUM FOR THE ATTORNEY GENERAL

At the request of the Deputy Attorney General, this Office has prepared the following analysis of the constitutional issues raised by S. 114, a bill to establish procedures for the imposition of the sentence of death for certain federal crimes.* The death penalty is presently an authorized sentence upon conviction of at least ten federal offenses, including murder, treason, espionage, rape, air piracy and several other felonies if death results from the crime.[1] Since the Supreme Court's decision in *Furman* v. *Georgia,* 408 U.S. 238 (1972), the constitutionality of these sections has been in doubt because they lack guidelines for the exercise of sentencing discretion.

---

*NOTE: The text of S. 114 as introduced in the Senate in 1979 appears at 125 Cong. Rec. 782-83 (January 23, 1979). Ed.

[1] *See* 18 U.S.C. § 34 (destruction of motor vehicles or motor vehicle facilities where death results); 18 U.S.C. § 351 (assassination or kidnapping of a Member of Congress); 18 U.S.C. § 794 (gathering or delivering defense information to aid a foreign government); 18 U.S.C. § 1111 (murder in the first degree within the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1716 (causing death of another by mailing injurious articles); 18 U.S.C. § 1751 (murder or kidnapping of a President or Vice President); 18 U.S.C. § 2031 (rape within the special maritime or territorial jurisdiction of the United States); 18 U.S.C. § 2381 (treason); 49 U.S.C. § 1472(i) (aircraft piracy). S. 114 would make some changes in these provisions, including deletion of the death penalty for rape not resulting in death (*see Coker* v. *Georgia,* 433 U.S. 584 (1977)) and kidnapping in the course of a bank robbery not resulting in death. The bill would add a provision authorizing the death penalty for murder of a foreign official.

Prior to considering the issues raised by S. 114, it may be helpful briefly to review the recent Supreme Court decisions on capital punishment. In *Furman,* a five-Justice majority ruled in a per curiam opinion that the imposition of the death penalty in the cases before the Court would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[2] Two of those Justices were of the opinion that capital punishment is *per se* unconstitutional.[3] The remaining three Justices did not reach the question whether the death penalty is unconstitutional in all circumstances. Justice Douglas concluded that the discretionary statutes in question were "pregnant with discrimination" in their operation and thus violated the Equal Protection Clause of the Fourteenth Amendment.[4] Justice Stewart objected to the penalty being applied in "so wantonly and so freakishly" a manner.[5] Justice White concluded that as the statutes were administered, they violated the Eighth Amendment because the penalty was "so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice."[6]

In *Gregg* v. *Georgia,* 428 U.S. 153 (1976), the Court reviewed the Georgia statute enacted in response to *Furman* and found it sufficient to overcome Eighth Amendment objections. *Id.* at 207.[7] Justices Stewart, Powell, and Stevens found four features of the statute to be particularly important: (1) the sentencer's attention was drawn to the particularized circumstances of the crime and of the defendant by reference to aggravating and mitigating factors; (2) the discretion of the sentencer was controlled by clear and objective standards; (3) the sentencer was provided with all the relevant evidence during a separate sentencing hearing, while prejudice to the defendant was avoided by restricting information on aggravating circumstances to that comporting with the rules of evidence; and (4) there was a system of appellate review of the sentence to guard against arbitrariness, excessiveness, and disproportionality. These conclusions were summarized as follows:

> [T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of

---

[2] 408 U.S. at 239–40.

[3] *Id.* at 257 (Brennan, J., concurring); *id.* at 314 (Marshall, J., concurring).

[4] *Id.* at 256–57.

[5] *Id.* at 310.

[6] *Id.* at 312–13.

[7] In companion cases, *Woodson* v. *North Carolina,* 428 U.S. 280 (1976), and *Roberts* v. *Louisiana,* 428 U.S. 325 (1976), a plurality ruled that imposition of mandatory death sentences violated the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments.

the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Id.* at 195. In a separate opinion, Justices White, Burger, and Rehnquist concurred in the judgment. *Id.* at 211–27.

In *Lockett* v. *Ohio,* 438 U.S. 586 (1978) and the companion case, *Bell* v. *Ohio,* 438 U.S. 637 (1978), the Court again considered the constitutionality of a State statute enacted in response to *Furman.* The Ohio statute at issue also set forth the aggravating and mitigating factors to be considered in the imposition of the death penalty. If the case went to trial, however, only three mitigating factors could be considered. Without a finding of one of these factors, and with a finding of an aggravating factor, imposition of the death penalty was mandatory. While the Court by a vote of seven to one found the imposition of the death penalty in this case to be unconstitutional, again there was no majority opinion.

Chief Justice Burger and Justices Stewart, Powell, and Stevens based their decision on the conclusion that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." [8] Justice Marshall adhered to his view that the death penalty is unconstitutional *per se.* Justice Blackmun found that the application of the penalty to an aider and abettor without regard to a specific *mens rea* in relation to the killing to be cruel and unusual. He also found that the statute violated the rule set down in *United States* v. *Jackson,* 390 U.S. 570 (1968), in that it permitted a judge who accepted a guilty plea to avoid imposing the death penalty in the interest of justice, but authorized consideration of only three mitigating factors if a defendant went to trial. Finally, Justice White objected to the Ohio statute because it included an aider and abettor within the scope of the death penalty without a finding that the defendant "engaged in conduct with the conscious purpose of producing death." [9]

The Court also has held that in addition to requiring certain procedural safeguards for imposition of the death penalty, the Eighth Amendment bars use of the death penalty if it is excessive in relation to the crime committed. *Coker* v. *Georgia,* 433 U.S. 584 (1977). In *Coker,* the Court concluded that the death sentence for rape of an adult woman when death did not result was disproportionate to the crime. *Id.* at 592.

---

[8] *Lockett* v. *Ohio,* 438 U.S. at 604.

[9] *Id.* at 627–28.

Recently, the Court again reviewed a death sentence imposed under the Georgia statute. In *Godfrey* v. *Georgia*, 446 U.S. 420 (1980), the Court considered whether the Georgia Supreme Court had adopted such a broad and vague construction of one of the statutory aggravating circumstances as to violate the Eighth and Fourteenth Amendments. The aggravating circumstance in question provided that a person could be sentenced to death if the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code Ann. § 27–2534.1(b)(7) (Supp. 1975). The Court previously had held in *Gregg* v. *Georgia*, 428 U.S. 153 (1976), that this statutory aggravating circumstance is not unconstitutional on its face. In the plurality opinion in *Godfrey*, written by Justice Stewart, joined by Justices Blackmun, Powell, and Stevens, the Court ruled that in upholding Godfrey's sentence, the Georgia Supreme Court did not satisfy the § (b)(7) criteria the Georgia high court itself had laid out in its prior cases. In light of the facts and circumstances of Godfrey's offense, the Court concluded that the Georgia Supreme Court did not apply a constitutional construction of § (b)(7). Justice Stewart stated: "There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." 446 U.S. at 433. In a concurring opinion, Justice Marshall, joined by Justice Brennan, adhered to his view that the death penalty is unconstitutional in all cases, and, in addition, agreed with the plurality that the Georgia Supreme Court's construction of § (b)(7) in this case was unconstitutionally vague. He suggested that the sentencing procedures of the type approved in *Gregg* are doomed to failure because the criminal justice system is incapable of guaranteeing objectivity and evenhandedness. Chief Justice Burger and Justices Rehnquist and White dissented, warning that the Court should not put itself in the role of second-guessing state judges and juries.

S. 114 seeks to establish constitutional procedures for the imposition of the death sentence upon conviction of federal crimes for which the death penalty is authorized. The bill would amend Title 18 of the United States Code, rather than the Federal Rules of Criminal Procedure, as some previous bills have proposed.[10] It provides that after conviction of a capital offense the defendant shall be subject to the death penalty only if a hearing is held in accordance with specified procedures. The hearing would be conducted before the jury which determined the defendant's guilt, unless, under specified circumstances, a new jury must be impaneled or the parties agree that the court alone conduct the hearing. At this sentencing hearing, information would be presented as to any matter relevant to the sentence, including matters

---

[10] S. 114 is not coordinated with S. 1722, the bill to revise Title 18 of the United States Code. In its present form, S. 1722 does not authorize the penalty of death for any crime. *See* S. 1722, Part III—Sentences.

relevant to specified aggravating and mitigating factors. The jury, or if there is no jury, the court, is required to return special findings identifying any aggravating and mitigating factors found to exist. The burden of establishing the existence of any aggravating factors is on the government, and is not satisfied unless established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless established by a preponderance of the information.

If none of the specified aggravating factors are found to exist, the court must impose an authorized sentence other than death. If one or more of the aggravating factors are found to exist, then it must be determined whether the aggravating factors outweigh the mitigating factors, or, in the absence of mitigating factors, whether the aggravating factors are sufficient in themselves to justify a sentence of death. Upon a jury finding that a sentence of death is justified, the court is required to sentence the defendant to death. The sentence of death is subject to review by the court of appeals.

There have been previous attempts to bring the federal death penalty provisions into compliance with the constitutional standards identified by the Court in *Furman, Gregg,* and *Lockett.* S. 114 is very similar to S. 1382, which was introduced in the 95th Congress by the late Senator McClellan for himself and others. Prior to introducing S. 1382, Senator McClellan requested the Department of Justice to review the draft bill and comment with respect to its constitutionality in light of the recent Supreme Court decisions. Former Attorney General Bell responded to Senator McClellan by letter dated March 25, 1977. The letter stated that "the procedures set forth in the draft bill are consistent with the decision in the *Furman* case, and are also consistent with the opinions of the Supreme Court in *Gregg* v. *Georgia* . . . and *Proffitt* v. *Florida.* . . ." [11] Attorney General Bell's letter concluded: "We believe that the proposed bill would be found by the Supreme Court to meet constitutional requisites" and "I support your efforts to bring it to the attention of the Senate."

The following year, hearings were held on S. 1382 and H.R. 13360, a House bill to amend the Federal Rules of Criminal Procedure to provide for sentencing procedures in capital cases. A representative of this Department testified on both bills, generally concluding that, although the Court is unusually divided on these issues and any analysis thus is necessarily speculative, the bills probably satisfied the standards of the case law.[12]

---

[11] In *Proffitt* v. *Florida,* 428 U.S. 242 (1976), a case decided with *Gregg* and *Jurek* v. *Texas,* 428 U.S. 262 (1976), a plurality upheld a Florida statute which directed the trial judge to weigh eight aggravating factors against seven mitigating factors to determine whether to impose the death penalty.
[12] In 1977, Mary Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, testified on S. 1387 before the Senate Subcommittee on Criminal Laws and Procedures of the Senate Judiciary
Continued

S. 114 was introduced by Senator DeConcini for himself and Senator Thurmond on January 23, 1979. It was referred to the Committee on the Judiciary which, on January 17, 1980, reported favorably thereon with minor technical amendments. S. Rep. No. 554, 96th Cong., 2d Sess. 1 (1980). No hearings were held by the Committee. In the Senate report, Senators Kennedy, Culver, and Leahy set forth their individual views opposing S. 114 and urging that "capital punishment is wrong in principle, wrong as a matter of policy, and wrong as drafted in S. 114." *Id.* at 33. Senator Baucus also presents his individual views. He states that the bill "is flawed by its precipitous method of passage by the Senate Judiciary Committee, its overly broad application to non-homicidal Federal crimes, and serious constitutional inadequacies," and recommends that the Senate recommit S. 114 to the Judiciary Committee. *Id.* at 34–5.[13] On March 7, 1980, 22 Senators, including Senators on both sides of the death penalty issue, signed a "Dear Colleague" letter, stating that they will move to recommit S. 114 or any similar bill to the Judiciary Committee so that it may be presented to the Senate "only after full hearings and debate." It is against this background that we analyze the constitutional issues raised by S. 114.

## I. Discussion

Because of the controversy surrounding the death penalty, and the several recent Supreme Court decisions which failed to command a clear majority, any death penalty legislation is bound to raise difficult constitutional questions. Some of the questions identified below were raised by prior legislation and have been the subject of extensive testimony before congressional committees. Other issues discussed here are raised by provisions in S. 114 which did not appear in the prior legislation. As with the prior bills, it is not possible to state definitively how the Court would resolve each of the issues raised by S. 114. We have attempted to identify provisions likely to be challenged as constitutionally inadequate and to indicate where possible how we think these issues would be resolved under the case law to date.

### 1. Determination by Majority Vote of Aggravating and Mitigating Factors

Both S. 1382 and H.R. 13360 required unanimity in all jury findings. S. 114, however, provides that the jury's findings of aggravating or

---

Committee. She again testified on S. 1382 on April 27, 1978, before the Senate Judiciary Committee itself. On July 17, 1978, after the *Lockett* decision, she testified on H.R. 13360 before the Subcommittee on Criminal Justice of the House Judiciary Committee. There have been no hearings in the Senate on death penalty legislation since the *Lockett* decision was issued.

[13] Senator Baucus notes that although the issue of capital punishment has been considered by the Senate Judiciary Committee in the past, S. 114 was not discussed or evaluated by the Committee in the 96th Congress. He notes that new members of the Senate have not had an opportunity to consider the bill in hearings and none of the members of the Committee have considered the changes in the bill made prior to introduction this session. S. Rep. No. 554, 96th Cong., 2d Sess. 34 (1980).

mitigating factors "shall be made by majority vote." If one or more aggravating factors are found to exist, the jury must then consider whether the aggravating factor(s) sufficiently outweigh any mitigating factors, or, in the absence of mitigating factors, whether the aggravating factor(s) is itself sufficient to justify a sentence of death. Based upon these considerations, the jury must return a finding by unanimous vote as to whether a sentence of death is justified.

A criminal defendant's right to trial by jury is guaranteed both in Article III, § 2, clause 3, and in the Sixth Amendment. Rule 31(a) of the Federal Rules of Criminal Procedure requires that the verdict be unanimous. The Supreme Court has determined that this unanimity requirement in federal criminal cases is constitutionally based. *See John-son* v. *Louisiana*, 406 U.S. 356 (1972); *Apodaca* v. *Oregon*, 406 U.S. 404 (1972). *See also United States* v. *Scalzitti*, 578 F.2d 507, 512–13 (3d Cir. 1978); *United States* v. *Gipson*, 553 F.2d, 453, 456 (5th Cir. 1977). The question raised here is whether this requirement of a unanimous verdict extends to the sentencing phase of a capital case.[14] This question has never been directly addressed by the Court.

In *Andres* v. *United States*, 333 U.S. 740 (1948), the Court suggested that unanimity is required in all federal jury verdicts. In *Andres*, the petitioner had been sentenced to death upon conviction of first degree murder. The determinative statute provided that where the accused is convicted of murder in the first degree the jury may qualify its verdict by adding the words "without capital punishment," in which event the punishment must be imprisonment. The government contended that the statute required that the jury first unanimously decide guilt or innocence, and, having done so, then consider whether to recommend mercy, but that if they failed to reach a unanimous agreement to recommend mercy, the guilty verdict without a recommendation should stand as the verdict of the jury. The petitioner contended that the proper construction should be that unanimity is required both as to guilt and punishment, and therefore, if the jury were not unanimous as to the death penalty, he should not be condemned. The Court concluded that the statute required that the jury's decision on both guilt and whether the punishment of death should be imposed must be unanimous. As to the constitutionality of non-unanimous verdicts, the Court wrote:

---

[14] A related question that could be raised relates to S. 114's provision that a jury impaneled for the sentencing hearing "shall consist of twelve members, but, at any time before the conclusion of the hearing, the parties may stipulate with the approval of the court that it shall consist of any number less than twelve." The same provision was included in S. 1382, and a similar provision appeared in H.R. 13360. In testimony on these bills in 1978, this Department noted that, while stipulation of the parties is normally adequate to avoid a claim of denial of Sixth Amendment rights, the Court may consider this provision impermissible in cases in which a death sentence may be imposed. Without stating that the provision is constitutionally inadequate, it was suggested that, given the Court's close scrutiny of procedures used to impose the death penalty, the committee might wish to consider whether a smaller jury is warranted. *See generally Ballew* v. *Georgia*, 435 U.S. 223, 232–39 (1978); *Williams* v. *Florida*, 399 U.S. 78, 103 (1970).

> Unanimity in jury verdicts is required where the Sixth and Seventh Amendments apply. In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury. A verdict embodies in a single finding the conclusions by the jury upon all the questions submitted to it.

*Id.* at 748. The Court noted that its construction of the statute was more consonant with the history of the Anglo-American jury system than the construction urged by the government.

This issue has not been discussed in the recent cases upholding death penalty statutes. In *Gregg* v. *Georgia*, jury unanimity was required as to a finding of an aggravating circumstance. 428 U.S. 153, 207–08. In *Proffitt* v. *Florida*, 428 U.S. 242 (1976), the statute provided that the jury's verdicts could be determined by majority vote, but the verdict is advisory only; the actual sentence is determined by the trial judge. *Id.* at 248–49. In *Jurek* v. *Texas*, 428 U.S. 262 (1976), the Court noted that the Texas law is unclear as to the procedure to be followed in the event that the jury is unable to answer the questions regarding aggravating circumstances, but does require that the jury findings as to aggravating circumstances be unanimous. *Id.* at 269 n.5.

The Court has often repeated that the penalty of death is qualitatively different from any other sentence and calls for a greater degree of reliability in sentencing. Even if a majority vote would be permissible for determination of sentences less than death, it may not be permissible for capital punishment decisions. Concerns expressed by the Court in *Ballew* v. *Georgia*, 435 U.S. 223, 232–36 (1978), regarding comparative unreliability of verdicts reached by smaller juries, also arise when one contrasts majority votes with unanimous votes.

The procedure established by S. 114 also runs the risk of being labeled arbitrary. The Court has emphasized that it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. *Gardner* v. *Florida*, 430 U.S. 349, 358 (1977). Under S. 114, it is possible that only seven jurors would find that there is a reason to impose the death sentence but that all twelve would nevertheless approve the death penalty. This raises serious questions as to the actuality, as well as the appearance, of arbitrary decisionmaking rather than decisionmaking based on reason.[15]

---

[15] Even if unanimity is not generally required in jury sentencing verdicts, it could be argued that for sentencing in capital cases, at least some of the aggravating factors rise to the level of elements of the crime and thus must be found to exist by unanimous vote. In *Jurek* v. *Texas*, 428 U.S. 262 (1976), the Court approved the statute in question although it did not list aggravating circumstances to be considered, because Texas had limited the categories of murders for which a death sentence could be imposed and thus accomplished the same result. *Jurek* could be read to suggest that the findings as to

Continued

## 2. Limiting Consideration of Mitigating Factors

S. 114 provides that at the sentence hearing, information may be presented as to any matter relevant to the sentence. It further provides that in addition to the trial transcript and exhibits, any other information relevant to any mitigating or aggravating factor, including those set forth in the bill, may be presented by either the government or the defendant. In the subsection concerning the return of findings, however, the bill provides: "It shall return special findings identifying any aggravating and mitigating factors, *set forth in subsections (f), (g), and (h), found to exist."* (Emphasis added.) It is directed to weigh against any aggravating factors "any mitigating factors *found to exist. . . ."* (Emphasis added.) There is, therefore, considerable ambiguity with respect to whether the drafters of S. 114 intended to circumscribe the jury's consideration of mitigating factors. The summary Senate Committee Report is unilluminating on this point.

In *Lockett* v. *Ohio,* 438 U.S. 586, 604 (1978), the Court held that the sentencer cannot be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Chief Justice Burger, writing for the Court, noted that the nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional 0requirement in imposing the death sentence. In *Lockett,* the statute at issue provided that if a verdict of aggravated murder with specifications was returned, the trial judge must impose a death sentence unless, after "considering the nature and circumstances of the offense" and the defendant's "history, character, and condition," he found by a preponderance of the evidence that one of three mitigating factors were present. The Court rejected the contention that the language allowing the judge to consider other factors in determining whether any of the mitigating circumstances existed corrected the statute's deficiency because, although these other factors could be considered, one of the enumerated factors had to be found to avoid imposition of the death penalty. Similarly, although S. 114 allows the sentencer to consider all information received during the hearing, it appears that its findings may include only those mitigating factors listed in subsection (f), and it is only these mitigating factors that can be weighed against the aggravating factors found to exist. If the intent of the bill is to limit the mitigating factors which may be considered, it seems to violate the rule set forth in *Lockett.* If this is not the intent of the bill, this ambiguity should be clarified.

---

aggravating circumstances may be compared for some purposes to the findings of the elements of the crime. *Compare Mullaney* v. *Wilbur,* 421 U.S. 684, 697-98 (1975) *with Patterson* v. *New York,* 432 U.S. 197 (1977).

### 3. Allowing Admission of all Relevant Evidence Regardless of Its Admissibility Under the Rules of Evidence

S. 114 provides that either the Government or the defendant may present any information relevant to the sentence "regardless of its admissibility under the rules governing admission of evidence at criminal trials." This modifies the section of S. 1382 which provided that any information relevant to any mitigating factor may be presented regardless of its admissibility under the rules governing admission of evidence at criminal trials, but that the admissibility of information relevant to any aggravating factor must be governed by such rules. H.R. 13360 also provided that the rules of evidence would govern admission of evidence regarding aggravating circumstances.

In *Gardner* v. *Florida,* 430 U.S. 349 (1977), the Court ruled that the petitioner was denied due process when a judge, overruling the jury's recommendation of a life sentence, imposed a death sentence based on information contained in a confidential presentence report. Justice Stevens, writing for a plurality, emphasized that the opportunity to challenge the accuracy or materiality of sentencing information is essential. *Id.* at 356. Although the practice in *Gardner* is distinguishable from the practice here questioned, the case raises questions as to the validity of eliminating the evidentiary requirements.

The Georgia statute approved in *Gregg* provides that the sentencing hearing is subject to the laws of evidence and that the jury or judge shall hear "evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of *nolo contendere* of the defendant, or the absence of any such prior criminal convictions and pleas. . . ." *See* 428 U.S. at 209 n.2. In discussing the requirement that a jury be given guidance in its decisionmaking, Justice Stewart noted that the provision of relevant information under "fair procedural rules" is one of the ways to guarantee that the information provided at the sentencing hearing will be properly used. *Id.* at 192. In rejecting petitioner's objection to the wide scope of evidence and argument allowed at presentence hearings, the Court wrote:

> We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. (Citation omitted.) So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

*Id.* at 203–04.

The current federal rules place no restriction on the type of information a court may consider in arriving at a sentencing determination. Section 3577 of Title 18 provides: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." It is clear under *Lockett* that the sentencer may not be precluded from consideration of any mitigating factor. It is also clear, however, that fair procedural rules and a resulting greater degree of reliability are required in capital cases. This suggests that requiring adherence to the rules of evidence, at least for purposes of receiving information regarding aggravating circumstances, may be advisable. The Court's discussion in *Gregg* makes it clear that open and far-ranging argument is possible even when the rules of evidence are observed. The Judiciary Committee report on the bill does not state why this change was made. S. Rep. No. 554, 96th Cong., 2d Sess. 15 (1980). It merely notes that both parties are permitted to present arguments as to the adequacy of the information.

### 4. Vagueness of Language Specifying Aggravating and Mitigating Factors

S. 114 specifies that one of the aggravating factors the sentencer shall consider is whether "the defendant committed the offense in an especially heinous, cruel, or depraved manner." The issue raised by this language is whether it is so broad and vague as to give no guidance to the jury, yielding an arbitrary result and thus violating the Eighth Amendment. A similar challenge was made to certain statutory language in *Gregg*. Petitioner in *Gregg* challenged the language of three aggravating factors in the Georgia statute: (1) the section that authorizes the jury to consider whether a defendant has a "substantial history of serious assaultive criminal convictions" (Ga. Code Ann. § 27–2534.1(b)(1) (Supp. 1975)); (2) the section that speaks of creating a "great risk of death to more than one person" (Ga. Code Ann. § 27–2534.1(b)(3) (Supp. 1975)); and (3) the section authorizing the jury to consider whether the "offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of the mind, or an aggravated battery to the victim" (Ga. Code Ann. § 27–2534.1(b)(7) (Supp. 1975)). As to the first section, Justice Stewart noted that the Supreme Court of Georgia held this provision impermissibly vague in *Arnold* v. *State*, 236 Ga. 534, 540, 224 S.E.2d 386, 391 (1976), because it did not provide the jury with sufficiently clear and objective standards. As to the second section, the Court conceded that the language of subsection (b)(3) might be susceptible to an overly broad interpretation, but stated that the Supreme Court of Georgia had not so construed it. The third section challenged, subsection (b)(7), most closely parallels the language

in question in S. 114, which is arguably even more vague than § (b)(7). The petitioner challenged § (b)(7) as both overbroad and impermissibly vague. Again relying on narrow constructions of the language by the Georgia courts, these challenges were rejected. 428 U.S. at 201, 202 n.54.

The language defining the aggravating circumstances in the Florida statute approved in *Proffitt* v. *Florida,* 428 U.S. 242, 255-57 (1976), also was asserted to be so vague and so broad that virtually any person convicted of a capital crime would be eligible for the death penalty. In particular, the petitioner attacked the language authorizing the death penalty if the crime is "especially heinous, atrocious, or cruel" or if "[t]he defendant knowingly created great risk of death to many persons." Fla. Stat. Ann. § 921.141(5)(c)(h) (Supp. 1976–1977). The Court again looked to interpretations by the state courts and decided that it could not conclude that the language "as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Id.* at 255-56.

The Court has put all lower courts on notice, however, that it carefully will scrutinize application of these ambiguous provisions. In *Godfrey* v. *Georgia, supra,* the Court adhered to its ruling in *Gregg* that § (b)(7) was not unconstitutional on its face. The plurality's reading of the Georgia court's interpretations of § (b)(7) led them to the conclusion, however, that the § (b)(7) circumstance cannot be found to exist absent serious physical abuse of the victim before death. Because no claim was made that Godfrey physically abused his victims before murdering them, the Court ruled that § (b)(7), as interpreted by the Georgia Supreme Court, had not been properly applied by that court in this case. Their decision was overturned because they did not constitutionally apply § (b)(7) to the facts and circumstances of the offense and the state of mind of the defendant.

The language of S. 114, referring to commission of the offense "in an especially heinous, cruel, or depraved manner," is even broader than § (b)(7) of the Georgia statute. It does not qualify these general terms by requiring a finding of "torture, depravity of mind, or an aggravated battery to the victim" as does the Georgia statute. Because any murder could be described as "heinous, cruel or depraved," the provision, without additional qualifications, probably does not meet the constitutional requirements repeated in *Godfrey,* that the sentencer's discretion be channeled by "clear and objective standards," that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." 446 U.S. at 428 (footnotes omitted).[16]

---

[16] One of the statutory mitigating factors also may be too vague. S. 114 requires that the jury consider whether the defendant was "youthful at the time of the crime." This vague phrase could

Continued

## 5. Imposition of the Death Penalty for Non-Homicidal Crimes

S. 114 itself does not specify the sentences that may be imposed for capital crimes. It does, however, amend some of the substantive sections that do specify the elements of the crimes and the authorized sentences. Most of the crimes included must result in the death of the victim before the death penalty is authorized. There are two exceptions, however, for espionage (18 U.S.C. § 794(a)) and treason (18 U.S.C. § 2381). The Court's ruling in *Coker*, that the death penalty is unconstitutionally excessive in relation to the crime of rape of an adult woman, raises the question whether the death penalty is excessive in relation to any crime in which death does not result.[17]

In *Coker*, Justice White, speaking for the plurality, characterized the test first enunciated in *Gregg* as (1) whether the sentence makes a measurable contribution to acceptable goals of punishment, and (2) whether the sentence is grossly out of proportion to the crime. 433 U.S. at 592. The plurality examined the practice in other countries and the position taken by those states which had reinstated the death penalty after *Furman* and concluded that the modern approach was not to impose the death penalty for rape. It then brought its own judgment to bear on the question of the acceptability of the death penalty under the Eighth Amendment. It reasoned:

> Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, rape by definition does not include the death of or even the serious injury to another person. The murderer kills; the rapist, if no more than that, does not. Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair. We have the abiding conviction that the death penalty, which "is unique in its severity and irrevocability," *Gregg* v.

---

easily be amended to specify below what age a defendant should be considered "youthful." The International Covenant on Civil and Political Rights, signed on December 19, 1966, and entered into force on March 3, 1976, provides in Article 6, § 5, that the death sentence shall not be imposed for crimes committed by persons below 18 years of age. This Covenant was transmitted by the President to the Congress on February 23, 1978. The Congress has held hearings on the Covenant but has not yet acted. *Four Treaties Pertaining to Human Rights: Message from the President of the United States,* S. Exec. Doc. C, D, E, F, 95th Cong., 2d Sess. 25 (1978); *International Human Rights Treaties: Hearings on Exec. Doc. C, D, E, and F. 95-2, Four Treaties Relating to Human Rights Before the Senate Committee on Foreign Relations,* 96th Cong., 1st Sess. (1979).

[17] In his dissent in *Coker,* Chief Justice Burger wrote: "The clear implication of today's holding appears to be that the death penalty may be properly imposed only as to crimes resulting in death of the victim. This casts serious doubt upon the constitutional validity of statutes imposing the death penalty for a variety of conduct which, though dangerous, may not necessarily result in any immediate death, *e.g.,* treason, airplane hijacking, and kidnapping." 433 U.S. at 621.

*Georgia,* 428 U.S. at 187, is an excessive penalty for the rapist who, as such, does not take human life.

433 U.S. at 598. The fact that one of the statutory aggravating circumstances had to be found before the death penalty could be imposed did not convince the plurality that the penalty was not excessive. It wrote that the aggravating circumstances "do not change the fact that the instant crime being punished is a rape not involving the taking of life." *Id.* at 599.

Justices Brennan and Marshall concurred separately, reiterating their views that the death penalty is unconstitutional *per se.* Justice Powell concurred in the judgment that the death penalty was not appropriate in this case but dissented from that portion of the plurality opinion which suggested that the death penalty for rape would be excessive in all cases. Justices Burger and Rehnquist joined in dissent.

While S. 114 would eliminate the death penalty for rape, it would permit imposition of the penalty for treason and espionage if one of three aggravating factors was found to exist: (1) prior conviction of treason or espionage punishable by death or life imprisonment; (2) knowingly creating a grave risk of substantial danger to the national security; or (3) knowingly creating a grave risk of death to another person. In addition, the bill limits the instances in which the death penalty may be applied for espionage to those in which the information furnished involves nuclear weapons, spacecraft or satellites, early warning systems, or similar protections against large-scale attack, or war plans, communications intelligence, cryptographic information, or information on major weapons systems or defense strategy.

To determine whether the imposition of the death penalty is constitutional with respect to these offenses, one must determine whether it makes a measurable contribution to acceptable goals of punishment and whether it is excessive in proportion to the crime. While there as yet is no satisfactory resolution of the debate over the deterrent effect of the death penalty, it is reasonable to assume that a court will give deference to the legislative judgment on the deterrent effect as long as this judgment appears rational.

The second part of the test, whether the punishment is excessive with respect to the crime, is more difficult to assess. In *Coker,* the Court looked to the consensus among the states and the international community and the practice of juries in modern times, as well as to historic practice, to assess the relationship between the penalty and the offense. This is more difficult with respect to crimes as rare as treason and espionage of the magnitude covered in S. 114.

Reference to the practice of the states is not particularly instructive in this instance. While some states include provisions relating to espio-

nage or treason within their criminal codes,[18] the crimes have generally been considered federal in nature. Thus, the judgment of state legislatures as to whether the death penalty is appropriate would seem to carry less weight with respect to these crimes than was the case with respect to rape.

Federal law has permitted the death penalty for treason since 1790 and for espionage since 1917. However, of the 33 federal executions carried out from 1930 to 1970, only two were for espionage—the Rosenbergs—and there were none for treason although the imposition of the death penalty for treason was specifically upheld in *Kawakita* v. *United States*, 343 U.S. 717, 745 (1952). There were also six executions for the related crime of sabotage in 1942. The federal experience, then, is limited in practice and provides little guidance apart from the consistency with which statutory law has authorized the penalty.

The attitude of the international community demonstrates some consistency in viewing the death penalty as appropriate for these particular crimes. In a report on capital punishment to the United Nations, the Secretary General noted that many nations which have generally abolished capital punishment retain it for a few exceptional crimes such as those related to the security of the state. U.N. Economic and Social Council, *Capital Punishment: Report of the Secretary General*, para. 18, U.N. Doc. E/5242 (1973). More specifically, the report notes, "The most common exceptional crimes punishable by death are treason and crimes relating to the security of the State." *Id.* at para. 32. Tables appended to the report show that the majority of member nations of the United Nations retaining capital punishment—about 100—and that 15 other nations, while abolishing capital punishment for ordinary crimes, retain it for exceptional crimes. *Id.* at Annex 1, 2-3. A 1975 update of this report shows that the picture remains largely unchanged. U.N. Economic and Social Council, *Capital Punishment: Report of the Secretary General*, U.N. Doc. E/5616 (1975) Annex 1, 2-3. While the practice in other nations is not conclusive in interpreting the requirements of our own Constitution, it does constitute a factor which courts may well consider in determining whether the penalty of death is excessive as applied to treason or espionage.

Approaching the question as did the Court in *Coker*, the consistent view of Congress from the earliest days of the nation, and the agreement of most nations in the world today that treason warrants the death penalty in some cases, strongly argues for the conclusion that the penalty is not grossly disproportionate to the offense. This is particularly true in light of the aggravating factors in S. 114 that must be proved beyond a reasonable doubt before the penalty could be imposed. Applying these same criteria, it is likely that a court would find the

---

[18] As reported in Bedau, Death Penalty in America, p. 43 (1967), 21 states included treason among capital crimes.

death penalty for treason to be constitutional if imposed in accordance with the procedures established in S. 114.

Although the result is less clear with respect to the offense of espionage, as it is limited in S. 114, it too would likely be upheld. The espionage laws, however, do have an attribute not common to other capital offenses. In this particular area there are numerous reasons why the government might elect not to prosecute even the most aggravated act. Prosecution might require the disclosure of sensitive foreign intelligence and counterintelligence surveillance techniques. Or, it might compromise confidential informants or liaison relationships with foreign governments. At least until comprehensive "graymail" legislation is passed, there is also the significant possibility that prosecution will be frustrated by requirements that highly classified information be disclosed in court, or that the truth or falsity of sensitive information be confirmed by the government. Apart from evidentiary problems, espionage prosecutions invariably raise questions of foreign policy, and in some cases prosecution will be eschewed in favor of some political accommodation with a foreign government as proved recently to be the case with Soviet spies. These and other reasons render espionage prosecutions rare, and raise a question whether on close examination the Supreme Court would find the imposition of capital punishment for this crime to be so rare—and so "freakish"—as to run afoul of the *Furman* reasoning.

In addition to treason and espionage, disproportionality questions may arise as to those crimes in which a death unintentionally results. S. 114, as did the prior legislation, retains authorization for imposition of the death penalty for a number of federal felonies in which death results, even if there is no finding that the defendant committed the crime with the conscious purpose of causing death. That a legislature has authority to enact felony-murder statutes is beyond constitutional challenge. But, as Chief Justice Burger pointed out in *Lockett,* "the definition of crimes generally has not been thought automatically to dictate what should be the proper penalty." 438 U.S. at 602. Together with *Coker,* Justice White's opinion in *Lockett* (concurring in part and dissenting in part) raises questions as to the use of capital punishment for these crimes. In concurring in the judgment of the Court, Justice White states that he would hold that death may not be inflicted for killing consistent with the Eighth Amendment without a finding that the defendant engaged in conduct with the conscious purpose of producing death.[19] He explained:

---

[19] If Justice White's analysis were to be adopted, the requirement in S. 114 that the defendant prove by a preponderance of the evidence the mitigating factor that he "could not reasonably have foreseen that his conduct in the course of the commission of murder, or other offense . . . would cause, or would create a grave risk of causing, death to any person" also may raise constitutional issues. *See Mullaney* v. *Wilbur, supra* note 15.

The value of capital punishment as a deterrent to those lacking a purpose to kill is extremely attenuated. Whatever questions may be raised concerning the efficacy of the death penalty as a deterrent to intentional murders—and that debate rages on—its function in deterring individuals from becoming involved in ventures in which death may unintentionally result is even more doubtful. Moreover, whatever legitimate purposes the imposition of death upon those who did not intend to cause death might serve if inflicted with any regularity is surely dissipated by society's apparent unwillingness to impose it upon other than an occasional and erratic basis. . . .

Under those circumstances the conclusion is unavoidable that the infliction of death upon those who had no intent to bring about the death of the victim is not only grossly out of proportion to the severity of the crime but also fails to contribute significantly to acceptable or, indeed, any perceptible goals of punishment.

438 U.S. at 625-26.

Justice Blackmun, commenting on Justice White's analysis, conceded that it might be that to inflict the death penalty in some such situations would skirt the limits of the Eighth Amendment proscription against gross disproportionality, but doubted that the Court could arrive at a workable disproportionality approach. The plurality, in view of its holding that Lockett was not sentenced in accord with the Eighth Amendment, did not address her contention that the death penalty is constitutionally disproportionate for one who has not been proved to have taken life, or to have attempted to take life, or to have intended to take life. *Id.* at 609 n.16.

### 6. Lack of Automatic Appellate Review

S. 114 would add a new section to Title 18—§ 3742—which would provide that the sentence of death shall be subject to review by the court of appeals upon appeal by the defendant. Such review would have priority over all other cases. S. 1382 contained a similar provision; H.R. 13360 provided for automatic review of all death sentences. In light of the Court's emphasis on the automatic review provision in *Gregg,* and the broadened discretion exercised by sentencers under *Lockett,* the question arises whether review at the behest of the defendant is an adequate safeguard against the random or arbitrary imposition of the death penalty.

In *Gregg,* the plurality stated that the requirement that the state supreme court review every death sentence is an added safeguard that the penalty will not be imposed on a capriciously selected group of convicted defendants. In particular, the Court noted that the propor-

tionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. 428 U.S. at 206. In his concurrence, Justice White, joined by the Chief Justice and Justice Rehnquist, stated that the provision for appellate review is an important aspect of the legislative scheme. He noted that to assist it in deciding whether to sustain the death penalty, the state supreme court is supplied, in every case, with a report from the trial judge in the form of a standard questionnaire. The Texas statute at issue in *Jurek,* however, provided for review by appeal of the defendant. In concluding that the Texas capital sentencing procedures do not violate the Eighth and Fourteenth Amendments, the Court stated that "[b]y providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." 428 U.S. at 276.

In our view, it is unlikely that the Court would overturn a statute because it failed to provide for automatic review. The need to ensure that the death penalty is not "wantonly and freakishly" imposed even if the defendant refuses to appeal, and the need to review *all* death sentences in the jurisdiction adequately to determine disproportionality, are, however, important congressional considerations.[20]

These are the central constitutional questions which would likely be raised in litigation should S. 114 be enacted. They are also the issues that should be explored if the Department elects to urge the Senate to submit this bill to the Judiciary Committee for further review.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[20] The critical role of appellate review is underscored by the *Godfrey* decision, in which the Court followed the principle set down in *Gregg,* that arguably vague and overbroad language is not facially unconstitutional because it cannot be assumed that a state supreme court will adopt an open-ended construction. In addition, Justice Marshall noted in his concurrence in *Godfrey* that since *Gregg* only three persons have been executed and two of them made no effort to challenge their sentence.