**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellant at No. 87–3727,**

**v.**

**STATE OF DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES, John A. Dillman, III, Director of State Personnel; Dwayne Olsen, Controller General, and Steven Golding, Budget Director.**

**Appeal of STATE OF DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Marcilee A. Bierlein, Director of State Personnel; Donald C. Dryden, Controller General, and Scott R. Douglass, Budget Director, Appellants at No. 87–3748.**

**Nos. 87–3727, 87–3748.**

United States Court of Appeals, Third Circuit.

Argued June 3, 1988.

Decided Jan. 13, 1989.

Charles A. Shanor, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Lorraine C. Davis, Asst. General Counsel, Dianna B. Johnston, Maria Beatrice Valdez (argued), Anne B. Thomas, Attys., E.E.O.C., Washington, D.C., for E.E.O.C.

Regina M. Mullen, Susan H. Kirk–Ryan (argued), Deputy Attys. Gen., Delaware Dept. of Justice, Wilmington, Del., for State of Del. Dept. of Health and Social Services, Marcilee A. Bierlein, Director of State Personnel; Donald C. Dryden, Con-

troller General, and Scott R. Douglass, Budget Director.

Before SEITZ, SLOVITER and HUTCHINSON, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

In this action under the Equal Pay Act, 29 U.S.C.A. § 206(d) (West 1978) (the Act), judgment was entered on a jury's verdict that appellees, the Delaware Department of Health and Social Services (DHSS) and Delaware's Director of State Personnel, had violated the Act and that their violation was willful. The district court subsequently granted appellees' motion for judgment notwithstanding the verdict and conditionally granted their motion for a new trial. For the reasons which follow, we will reverse the order of the district court and direct it to reinstate the judgment entered on the six-member jury's verdict of a willful violation.

### I.

During the relevant time period, DHSS recognized three levels of Public Health Nurses (PHNs) and Physician's Assistants (PAs). Pursuant to the statewide classification system then employed, PHNs I, II and III were compensated at pay grades 21, 22 and 23, while PAs I, II and III were compensated at pay grades 20, 22 and 24. In April, 1980, Donald Bloom, an employee at the Kent County Health Clinic (Clinic), was reclassified from PA II to PA III.[1] As a result of his reclassification, Bloom was more highly paid than every PHN working at the Clinic, who were all female.

Evidence at trial indicated that Bloom and the PHNs performed many of the same functions, but that PHNs had additional duties related to patient care and lab work which Bloom did not share. Some of the claimants also had various substantive or administrative functions beyond those required of Bloom or the PHN Is.

Soon after Bloom's promotion, the PHNs complained to their superiors that they were being paid less than he was for performing the same work. In March or April, 1981, they filed discrimination charges with the Equal Employment Opportunity Commission (EEOC). The EEOC notified DHSS of the charges in January, 1982 and of the possibility of Equal Pay Act violations on June 7, 1982.[2]

Pursuant to a DHSS audit completed in September, 1982, but made retroactive to July 1, 1982, PHNs and PAs were regraded. PHNs I, II and III were assigned pay grades 22, 23 and 24. PAs I and II were merged into PA I at a pay grade of 22 and PA IIIs remained at pay grade 24. Bloom was reclassified as a PA I and his pay grade reduced from 24 to 22. The EEOC treated this as bringing appellees in compliance with the Act's requirements as of July 1, 1982.

On June 28, 1983, the EEOC instituted suit in the United States District Court for the District of Delaware.[3] The EEOC asserted that appellees had willfully violated the Act by paying female PHNs less than Bloom for performing equal work and sought compensatory damages. Since a willful violation is subject to a three year statute of limitations, the EEOC sought recovery from June 29, 1980 to July 1, 1982, the date the wage disparity was eliminated.[4]

---

1. Bloom had requested a promotion upon receipt of his Bachelor of Science degree.

2. Initially, the EEOC sought relief for all PHNs employed by DHSS. On November 7, 1986, the district court granted appellees summary judgment with respect to those PHNs who did not work at the Clinic, reducing the number of claimants from over one hundred to seventeen. The propriety of this ruling is not challenged on appeal. At trial, the EEOC abandoned its claims for relief on behalf of four PHNs, reducing the number of claimants to thirteen.

3. Originally, the Budget Director and State Controller of Delaware were named as defendants. The district court granted their unopposed motion for a directed verdict at the end of the plaintiff's case. *See EEOC v. Delaware Dep't of Health and Social Servs.*, 667 F.Supp. 1057, 1060–61 (D.Del.1987).

4. The Act contains a two year statute of limitations which would, absent willfulness, limit the recovery to damages sustained from June 29, 1981 to July 1, 1982.

Trial commenced on December 1, 1986 before a six-person jury and two alternates. One juror was dismissed during the trial and replaced with an alternate. Immediately prior to charging the jury, the court initiated the following dialogue:

THE COURT: Before we bring the jury in, we have one alternate left. Alice mentioned that two of the jurors are not feeling too well today. I, in the past, if the attorneys are agreeable, have permitted the alternate to stay and deliberate with the jury. I would not do it if there was any objection, and when I've done it, I mentioned ahead of time, and I didn't today, but in view of the fact that we have two jurors who don't feel well, do the attorneys have any feeling about permitting the alternate to remain and deliberate with the jury?

MS. FLOWERS: Plaintiff does not.

THE COURT: You have no objection?

MS. FLOWERS: No objection.

MS. MULLEN: Defendants have no objection, Your Honor.

THE COURT: Okay, fine. I think, then, I will permit the alternate to remain and deliberate with the jury, and if by chance, one of the jurors becomes ill and cannot stay through the entire deliberations, we will still have a six-member jury left.

Joint Appendix (Jt.App.) at 605–06.

When these seven returned after their deliberations, the foreperson announced that the jury had reached a verdict finding that the appellees had violated the Act and had done so willfully. *Id.* at 619–20. A poll of the jury, however, revealed that the alternate had not been considered a voting member. *Id.* at 621. Upon questioning by the court, this individual agreed with the finding of an Equal Pay Act violation but not with the finding of willfulness. *Id.* at 622.

The court entered judgment in accordance with the verdict announced by the foreperson and appellees moved for judgment notwithstanding the verdict or, in the

alternative, a new trial. Since, in seeking a directed verdict, they argued only that they had proven the pay disparity was based on a "factor other than sex," an affirmative defense specifically set forth in the Act, the district court refused to consider their posttrial attacks on the EEOC's *prima facie* case in deciding the judgment n.o.v. motion. It agreed with appellees, however, that the evidence of DHSS's job classification system compelled the conclusion that the pay disparity was based on a "factor other than sex," thereby overcoming the EEOC's *prima facie* case and relieving appellees of any liability.

The district court, as required by Federal Rule of Civil Procedure 50(c), also conditionally ruled on the new trial motion. Because it felt that appellees' evidence on the affirmative defense overcame the *prima facie* case, the court concluded that the jury's verdict was against the weight of the evidence. Relying on a Department of Labor regulation, the court also held that a finding for the EEOC on its *prima facie* case with respect to ten PHNs could not be sustained. Accordingly, it also granted a new trial for all claimants on this ground, reasoning that since the jury's error "is likely to have affected the verdict of all thirteen of the PHNs, the interests of justice require that the new trial include all thirteen PHNs." *Delaware Dep't of Health and Social Servs.*, 667 F.Supp. at 1068.

On the issue of willfulness, the court determined that a new trial was warranted for two additional reasons. First, it held that the evidence at most demonstrated that appellees were negligent in not foreseeing the violations. Second, the court ruled that the jury consisted of seven voting members. Since the seven were not unanimous on whether appellees' violation was willful, the court found that there was no valid verdict on this point.

## II.

■ We first address, *sua sponte*, the question of our appellate jurisdiction.[5] The

---

5. After argument, the panel asked for, and the parties thereafter submitted, supplemental memoranda on this issue.

jury was not asked to determine damages and no damages were specified when judgment was entered. Had appellees immediately appealed from that judgment instead of moving for judgment n.o.v. or a new trial, we would ordinarily be required to dismiss the appeal. An order which establishes liability without fixing the amount of recovery is generally not final. *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 743–44, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976).

■■■ Here, however, the district court's ruling on appellees' post-trial motions resulted in entry of judgment in their favor. Moreover, the question of damages was not submitted to the jury for resolution, but was deferred for further proceedings. Where the jury was not to determine damages, we see no reason for holding that the district court's failure to take steps to specify the extent of appellees' liability, after concluding such liability did not exist as a matter of law, deprives its order of finality. This situation is not materially different from that which results when a district court grants a defendant's motion for judgment n.o.v. after a plaintiff's verdict in the liability phase of a bifurcated trial before the damages phase is begun. Such orders are routinely treated as appealable. *See, e.g., Collins v. Illinois*, 830 F.2d 692, 706 (7th Cir.1987) (reversing in part and remanding for determination of damages on Title VII retaliation claim); *Thomas v. Bakery, Confectionery and Tobacco Workers Union Local # 433*, 826 F.2d 755, 764 (8th Cir.1987) (reversing in part and remanding for determination of damages

resulting from breach of collective bargaining agreement and duty of fair representation), *cert. denied*, —— U.S. ——, 108 S.Ct. 1019, 98 L.Ed.2d 984 (1988). This appeal is proper, and we turn to the merits.

In doing so, we first set forth the standards governing our review. A ruling on a judgment n.o.v. motion is subject to plenary review. *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 113 (3d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987). We review a decision to grant a new trial based on the weight of the evidence for an abuse of discretion, but we "must ensure that the trial court has not simply substituted its judgment of the facts and the credibility of the witnesses for those of the jury; in other words, the new trial must be necessary to avoid a miscarriage of justice." *Shanno v. Magee Indus. Enterprises, Inc.*, 856 F.2d 562, 567 (3d Cir.1988) (citations omitted). The validity of the Department of Labor regulation, which the district court relied upon as one ground for the grant of a new trial, presents a question of law and our review is therefore plenary. *Link v. Mercedes–Benz of North America*, 788 F.2d 918, 921 (3d Cir.1986). Finally, the question of whether the parties have reached an agreement to vary a jury's normal size is a legal question subject to plenary review.[6]

### III.

■■■ With these general observations in mind, we first consider whether the entry of judgment n.o.v. for DHSS was proper. An Equal Pay Act case involves shifting burdens.[7] A plaintiff establishes a *pri-*

---

**6.** In some cases, the parties may agree to keep alternates available. In the presence of such an agreement, the district court has discretion as to the timing of substituting alternates for unavailable jurors. *Seese v. Volkswagenwerk A.G.*, 648 F.2d 833, 848 (3d Cir.) (in such cases, timing of replacement of juror with alternate "is a matter peculiarly within the district court's discretion"), *cert. denied*, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981). Our case involves the legal question of whether the parties have reached agreement with respect to the size of a jury.

**7.** 29 U.S.C.A. § 206(d)(1) provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential

ma facie case by showing that employees of opposite sex were paid differently for performing "equal work"; that is, work of substantially equal skill, effort and responsibility, under similar working conditions. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed. 2d 1 (1974); *Brobst v. Columbus Servs. Int'l*, 824 F.2d 271, 274 (3d Cir.1987), *cert. denied*, ___ U.S. ___, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988). The burden of persuasion then shifts to the employer to demonstrate the applicability of one of the four affirmative defenses specified in the Act. *Corning Glass*, 417 U.S. at 196, 94 S.Ct. at 2229; *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1136 (5th Cir.1983).[8]

The district court, in granting appellees' motion for judgment n.o.v., found that DHSS's classification system was based on a "factor other than sex." 29 U.S.C.A. § 206(d)(1)(iv). Since the appellees bore the burden of proof on this issue, their motion was properly granted only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.[9] *See Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); *Arkwright Mut. Ins. Co. v. Philadelphia Elec. Co.*, 427 F.2d 1273, 1275 (3d Cir.1970). In making this determination, we must view the evidence most favorably to the EEOC and accord it the benefit of all justifiable inferences. *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259 (3d Cir.1987), *cert. denied*, ___ U.S. ___, 109 S.Ct. 782, 102 L.Ed.2d 774 (1988); *Aloe Coal*, 816 F.2d at 113.

As evidence of DHSS's job classification system, appellees presented the testimony of John Dillman, Delaware Director of State Personnel. According to Dillman, the state employed a system developed by Hay & Associates:

It's a system by which you look at the various aspects of the job and what it takes in terms of knowledge, skills and abilities in order to perform a job. By doing this, it can break all jobs into factors which are common to each of those positions. It then assigns a value, or a weight, to the various factors, and what is required of the various factors, and the level of education, the level of experience, the level of expertise, that type of thing.

It then assigns a weight to the value of all these factors combined and compares that value to, of course, finding [sic] point on a pay scale.

Jt.App. at 485.

William Steele, a state personnel officer responsible for the compensation and classification systems, also explained the system:

Jobs are looked at using three anchors. The knowledge that is required in order to perform the job; the knowledge—know-how is the term that they use—and it is any type of knowledge you have to have when you come into the job in order to qualify for the position. The know-how is broken down into three sections: the required knowledge, any education and/or experience that is required in order to do the job, any management or supervisory skills that are required in order to do the job and any human rela-

---

based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

8. To prevail on an Equal Pay Act claim, a plaintiff need not prove that the employer intended to discriminate. Such a showing, however, may be used to establish that an employer's reliance on an affirmative defense is merely a pretext for discrimination. *Maxwell v. City of Tucson,* 803 F.2d 444, 446 (9th Cir.1986).

9. Appellees do not contest the district court's finding that the additional arguments for judgment n.o.v. made in their post-trial motion were not raised in their directed verdict motion. Accordingly, the district court correctly considered only whether appellees had established their affirmative defense in deciding if judgment n.o. v. was appropriate. *See Bonjorno v. Kaiser Alum. & Chem. Corp.,* 752 F.2d 802, 814 (3d Cir.1984), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).

tions factors that might be involved in the job.

The second factor is the problem-solving that is required in the position. What kind of problems do you have? How much independent thinking do you have to have in order to do the work?

And the third factor is the accountability, how much accountability does a person have to accomplish the function of the job, and what impact does that job have on the State as a whole?

*Id.* at 596–97. Steele then testified that his office classified PHNs I and II on July 13, 1977, assigning a point total of 256 and a pay grade of 20 to the former position, and a point total of 314 and a pay grade of 22 to the latter. *Id.* at 597–99. Finally, even the EEOC's expert witness on job classification, Dr. George Hagglund, stated that job classification systems which assign points to various aspects of a job are common in the public sector. *Id.* at 69–70.

This evidence is sufficient to permit a jury to find that DHSS employed a recognized, facially neutral classification system. The district court, however, after finding that appellees had produced sufficient evidence to show that DHSS used such a system, required the EEOC to show that it was applied in a gender-biased manner. The only evidence of discriminatory application to which the district court refers was Bloom's reclassification within four months of his request while the PHNs' collective reclassification took approximately two years. The court held that the routine reclassification of one individual as opposed to a "regrading" of the PHN position, was a legitimate explanation for this difference which EEOC had not refuted.[10] It concluded that "[b]ald speculation that the State was applying its facially neutral classification system in a sex-biased man-

ner is not sufficient to support a verdict...." *Delaware Dep't of Health and Social Servs.*, 667 F.Supp. at 1064.

This reasoning misperceives the nature of an Equal Pay Act case. The appellees had the burden of persuasion, not merely the burden of production, on their affirmative defense. On their judgment n.o.v. motion, the correct inquiry was not whether the EEOC introduced evidence that the apparently neutral classification system was misapplied, but whether, viewing the evidence most favorably to the EEOC, a jury could only conclude that the pay discrepancy resulted from operation of the system.

Under this standard, the grant of judgment n.o.v. cannot be sustained. While appellees offered some evidence of the principles generally used in classifying positions, they did not demonstrate how the system operated with respect to the particular positions at issue. Thus, they made no effort to explain how the point totals for PHNs and PAs were assigned or to otherwise justify the discrepancy in pay grades. Instead, they merely produced testimony that the PHNs I and II were classified in July, 1977 and introduced into evidence the evaluation sheets prepared at that time.[11] There was no evidence of the manner in which the PAs were classified and the only evaluations of those positions presented to the jury were from the reclassification which occurred in 1982. In the absence of further evidence, the jury lacked a full basis for comparing the evaluations of the PHNs and PAs during the relevant time period or for relating the procedures used in the reclassification to the method used in first setting up the Hay system. Therefore, a rational jury could remain unpersuaded. *Cf. Maxwell*, 803 F.2d at 447 (compliance with civil service requirements,

10. In DHSS's parlance, the determination of whether a particular position is classified properly is known as a "regrade." Jt.App. at 487. This involves a review of all individuals in the position, *id.* at 579, 645–52, as well as a comparison of the job with others in the state system. *Id.* at 487. In contrast, a "reclassification" looks only to whether a particular person is performing the duties of his present job or, instead, of a different one. *Id.* at 488.

11. These evaluation forms reflect the points assigned in the categories of "know-how," "problem solving," and "accountability." In addition, under a column entitled "slots," number or letter grades are provided for each of eight subsections. The forms contain no explanation of what the rankings for the subcategory mean, nor do they tell how points are assigned. *See* Jt.App. at 734–37.

without more, insufficient to establish affirmative defense of "merit system"); *Marshall v. Kent State Univ.*, 589 F.2d 255, 255–56 (6th Cir.1978) (per curiam) (same).

Similarly, a rational jury may have legitimately questioned whether Bloom was properly classified as a PA III. William Greve, DHSS's Personnel Administrator, testified that Bloom's promotion was justified because he was to function more independently, Jt.App. at 502–03, and a memorandum from Dr. George Bender, the PHNs' Health Officer, stated that Bloom had "more responsibility for independent decision making." *Id.* at 729. Bender's memorandum further stated that Bloom was functioning as a "team leader," and that although one PHN II also had this responsibility they were supervised at different levels. *Id.* Yet, there was no attempt to show that Bloom actually performed the duties in the PA III job description, and Bloom admitted he did not perform all those duties. *Id.* at 281–82. Appellees also failed to explain why Bloom was reclassified under the new system as a PA I in September, 1982, retroactive to July 1, 1982. These deficiencies must be viewed in light of the EEOC's proof that Bloom and the PHNs did the same work.[12]

Given this evidence, the jury was free to disbelieve appellees' assertion that the pay disparity resulted from the neutral application of the classification system. Accordingly, judgment was improperly entered in favor of appellees.

### IV.

Relying on the same reasoning which led it to grant judgment n.o.v., the district court concluded that appellees were entitled to a new trial because the jury's finding that they had not established their affirmative defense was against the weight of the evidence. Its holding on this point appears to be inseparable from its erroneous view that the EEOC was required to show that the classification system was not neutrally applied. That the EEOC did not make such a showing cannot be grounds for a new trial. To the extent the district court's opinion may be construed as a comment on the weight of the evidence under the correct legal standard, the court abused its discretion in granting a new trial on this theory. We find no basis in the record for concluding that the verdict was unjust. *Shanno*, 856 F.2d at 567.

### V.

The district court instructed the jury in accordance with an administrative regulation which provides the following illustrations of "similar working conditions":

For example, if some sales persons are engaged in selling a product exclusively inside a store and others employed by the same establishment spend a large part of their time selling the same product away from the establishment, the working conditions would be dissimilar. Also, where some employees do repair work exclusively inside a shop while others employed by the shop spend most of their time doing similar work in customers' homes, there would not be similarity in working conditions. On the other hand, slight or inconsequential differences in working conditions that are essentially

---

**12.** When considering the judgment n.o.v. motion, we must assume that the EEOC established a *prima facie* case, since appellees did not argue to the contrary in their directed verdict motion. Moreover, even were the post-trial attacks on the EEOC's *prima facie* case properly raised in the judgment n.o.v. motion, they would be inadequate to warrant such relief. The district court ruled that there was sufficient evidence to support a finding in favor of the EEOC on the first three prongs of its *prima facie* case and appellees do not argue otherwise. In granting a new trial, the sole reason the court gave for concluding that the jury could not have held for the EEOC on the final element—similar working conditions—was the applicability of the examples in 29 C.F.R. § 800.132 (1986). As discussed *infra* Part V, this was error. Our review of the record persuades us that the jury could properly have determined that the EEOC prevailed on this point under the instructions given. Accordingly, the jury's conclusion that the EEOC met its *prima facie* case withstands a judgment n.o.v. motion. The jury could have reasonably relied upon EEOC's proof of equal work in determining if appellees had adequately explained the reasons for Bloom's promotion and his subsequent reclassification.

similar would not justify a differential in pay.

29 C.F.R. § 800.132 (1986). The court found this regulation applicable in the instant case since ten of the thirteen PHNs performed at least half of their duties at the patients' homes while Bloom worked exclusively at the clinic. It concluded that the jury's finding that those ten PHNs and Bloom performed their duties under similar working conditions was against the great weight of the evidence and that the interests of justice warranted a new trial on the remaining three PHNs' claims as well. *Delaware Dep't of Health and Social Servs.*, 667 F.Supp. at 1067–68.

■■■ Although the Act does not empower the Department of Labor to promulgate binding regulations, the above provision "should be given deference unless inconsistent with the statute." *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1171 n. 10 (3d Cir.1977). In *Corning Glass*, the United States Supreme Court recognized the background against which the Act was adopted. Thus, it observed, Congress used terms which "incorporate[d] into the new federal Act the well-defined and well-accepted principles of job evaluation so as to ensure that wage differentials based upon bona fide job evaluation plans would be outside the purview of the Act." *Corning Glass*, 417 U.S. at 201, 94 S.Ct. at 2231. Applying this principle to the statutory phrase "working conditions," the Court stated:

> [T]he element of working conditions encompasses two subfactors: "surroundings" and "hazards." "Surroundings" measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and

their frequency. "Hazards" takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause. This definition of "working conditions" is not only manifested in Corning's own job evaluation plans but is also well accepted across a wide range of American industry.

*Id.* at 202, 94 S.Ct. at 2232 (footnotes omitted).

To the extent the regulation conflicts with the Supreme Court's construction of the statute, it is without effect. Here, the EEOC's expert testified that he considered whether Bloom and the PHNs worked under similar working conditions by reference to the factors used by employers in setting wages, which coincide with the elements identified in *Corning Glass*. The examples in the regulation do not appear to be grounded in these concerns. Indeed, they were deleted in August 1986 when the Department of Labor issued revised regulations to reflect the Supreme Court's interpretation of working conditions in *Corning Glass*. *See* 51 Fed.Reg. 29,816, 29,818 (1986); 29 C.F.R. § 1620.18 (1988). Under these circumstances, it was error to apply the cited examples, *Wetzel v. Liberty Mutual Ins. Co.*, 449 F.Supp. 397, 405 (W.D.Pa. 1978), and, given the testimony of the EEOC's expert, the jury's verdict clearly had substantial support in the record. Absent the regulation, there was no "basis in reason for [the district court's] conclusions as to the weight of the evidence and the injustice of the verdict." *Shanno*, 856 F.2d at 567 (quoting *Lind v. Schenley Indus.*, 278 F.2d 79, 91 (3d Cir.) (in banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).[13]

---

**13.** Appellees suggest that they were entitled to rely on the examples in the regulations. Effective July 1, 1979, responsibility for enforcement of the Act was transferred from the Department of Labor to the EEOC. *See* 44 Fed.Reg. 38,671 (1979). Appellees note that although the EEOC did not adopt the department's interpretations and opinions, it stated that "employers may, until the Commission issues its own interpretations of the Equal Pay Act, continue to rely on existing interpretations and opinions ... to the extent that they are not inconsistent with statutory revisions and judicial interpretations."

*Id.* Because the examples do not seem to comport with the statutory phrase "working conditions" as defined by the Supreme Court in *Corning Glass*, we reject appellees' reliance argument. Moreover, their probable invalidity should have become readily foreseeable after *Wetzel*, 449 F.Supp. 397, which refused to treat the examples in the regulation as dispositive and instead looked to whether the evidence sufficed under the *Corning Glass* standard. Finally, appellees' position is inconsistent with their

Nor is there any merit to the court's ruling that the jury either misconstrued or consciously disregarded the instructions. Jury instructions must be read as a whole. *Link,* 788 F.2d at 922; *Walters v. Mintec/International,* 758 F.2d 73, 76 (3d Cir. 1985). After reciting the example from the regulation, the court proceeded to instruct the jury that, "On the other hand, slight or inconsequential differences in working conditions that are essentially similar would not justify a differential in pay. Such differences are not usually taken into consideration by employers or in selective [sic] bargaining in setting wage rates." Jt.App. at 608. Thus, consistent with the instructions, the jury could properly have relied on Dr. Hagglund's testimony in reaching its verdict.

## VI.

The district court also granted a new trial on the issue of willfulness, concluding that the evidence was insufficient to support the jury's verdict under our decision in *Brock v. Richland Shoe Co.,* 799 F.2d 80 (3d Cir.1986), *aff'd sub nom. McLaughlin v. Richland Shoe Co.,* —— U.S. ——, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). There, we adopted the Supreme Court's definition of "willfulness" as used in the Age Discrimination in Employment Act's liquidated damages provision and held that the applicable test for purposes of the statute of limitations of the Fair Labor Standards Act (FLSA) was whether the employer knew or showed reckless disregard for whether its conduct violated the act. *Id.* at 83 (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). This position has now been endorsed by the Supreme Court. *McLaughlin v. Richland Shoe Co.,* 108 S.Ct. at 1681.[14]

■ The district court recognized that memoranda setting forth the PHNs' request were sent to the relevant state officials. *Delaware Dep't of Health and Social Servs.,* 667 F.Supp. at 1069-70. It noted, however, that neither these officials nor the PHNs considered the matter to be one of sex discrimination and determined that the evidence at most established negligence:

Since there was no evidence that any state official actually knew there might be a problem with sex discrimination, the question presented to the jury basically became whether the state officials recklessly disregarded the potential EPA violation. Based on the evidence of what information the PHNs gave to the state personnel officials and of those officials' familiarity with federal employment law, we can only conclude that none of the defendants recklessly disregarded the potential EPA violation. Nothing in the communications between the PHNs and the personnel officials indicate anything more than a simple failure to realize that sex discrimination could become an issue. We find from the evidence that the most that could reasonably be inferred is that the state officials were merely negligent in not foreseeing the potential sex discrimination involved in the PHNs' request for a regrade.

*Id.* at 1070.[15]

The EEOC asserts error, claiming that cases applying *Thurston* have "require[d] a showing that employers took some type of affirmative action to insure that their actions were not in violation of the law before they can prevail on the 'willfulness' issue" and that DHSS did not take such steps. Brief for Appellant at 40–41. Stat-

argument on willfulness that they were unaware of any potential violation of the Act.

**14.** The Equal Pay Act is a part of the FLSA and the same statute of limitations is applicable. *Richland Shoe,* 108 S.Ct. at 1680.

**15.** The district court instructed the jury on willfulness as follows:

Recovery of back wages is normally limited to two years, but may be extended to three years for a willful violation. The three-year

statute of limitation [sic] applies when the employer knew or showed reckless disregard for the matter of whether its payments of lower wages to the female Public Health Nurses was prohibited by the Equal Pay Act.

Reply Brief for Appellant, Addendum at 13. The adequacy of this instruction, which tracks the *Thurston* language approved in *Richland Shoe,* is not challenged. We see no plain error in it.

ed so broadly, the argument cannot survive *Richland Shoe.* In approving the *Thurston* formulation for use in cases under the FLSA, the Supreme Court rejected the Secretary of Labor's proposed standard "that would deem an FLSA violation willful if the employer, recognizing it might be covered by the FLSA, acted without a reasonable basis for believing that it was complying with the statute." *Richland Shoe,* 108 S.Ct. at 1682 (quoting petitioner's brief). The Secretary's approach, the Court reasoned, would "permit a finding of willfulness to be based on nothing more than negligence, or, perhaps, on a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *Id.* Thus, the Court noted:

> If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful under either petitioner's test or under the standard we set forth. If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then, although its action would be considered willful under petitioner's test, it should not be so considered under *Thurston* or the identical standard we approve today.

*Id.* at 1682 n. 13. Accordingly, the failure to determine whether a challenged pay practice violates the Act must be tested against the *Thurston* and *Richland Shoe* standards and is not itself necessarily sufficient to support a finding of willfulness.

■ The EEOC also maintains that, given the PHNs' request for "equal pay for equal work," appellees' conduct rises to the requisite level. Dillman testified that he "probably dismissed" the use of this phrase since it "means something to me as a personnel analyst, from a legal standpoint, but I don't know that it would have meant the same thing to a supervisor of employees who was concerned that her employees were not paid a high enough salary." Jt. App. at 489. On the other hand, he stated, a complaint of sex discrimination would have prompted him to think in terms of a legal problem and would have distin-

guished the PHNs' complaint from the numerous reclassification requests. *Id.* at 490. The EEOC contends that since DHSS officials knew the PHNs were female and Bloom was male, Dillman must have strongly suspected a violation of the Act when he saw the phrase "equal pay for equal work," Brief for Appellant at 38, and that his testimony reveals that appellees "consciously chose to ignore a potential EPA violation and apparently counted on the nurses not recognizing that they had an EPA claim." Reply Brief for Appellant at 12.

The jury could have drawn the inference which the EEOC asserts is warranted—that Dillman, personnel director for the State of Delaware, must have entertained a strong suspicion of an Equal Pay Act violation which, with the most cursory investigation, would have led to actual knowledge. An experienced, responsible official cannot consciously turn his head and choose to ignore such information. If he does, his actions meet the standard of willfulness set forth in *Richland Shoe.*

Accordingly, we cannot agree with the district court's conclusion that the evidence at most permits an inference of negligence. In reaching this result, the court ostensibly relied on the state officials' "familiarity with federal employment law," *Delaware Dep't of Health and Social Servs.,* 667 F.Supp. at 1070, and reviewed the testimony of some state officials. However, it did not expressly address Dillman's testimony. Regardless of whether the former officials acted willfully, a jury verdict of willfulness could be premised solely on Dillman's actions and the record is sufficient to allow a jury to conclude that he acted willfully. Given the district court's apparent failure to consider this possibility, we hold that it abused its discretion in granting a new trial.

## VII.

Finally, the district court held that the parties had agreed to a seven-person jury.

Since the alternate did not concur that appellees' violation of the Act was willful, the court determined that the verdict was not unanimous on willfulness and that a new trial was therefore required on this issue. This was error for the following reasons.

 Federal Rule of Civil Procedure 48 permits the parties to "stipulate that the jury shall consist of any number less than twelve." The District of Delaware, however, has adopted a local rule providing for the trial of all civil actions by a jury of six, unless the parties stipulate to a lesser number. D.Del.R. 5.5(C) (1983).[16] We need not decide whether the local rule prevents the district court from accepting a stipulation to a jury of more than six, nor whether such a construction of the rule would be valid. The rule establishes a standard jury size, allowing deviations only when the parties so stipulate. Upon review of the record, we are unable to say that these litigants reached an agreement to vary the usual number of six jurors.[17]

The parties expressed no objection to the district court's suggestion of "permitting the alternate to remain and deliberate with the jury." Jt.App. at 606.[18] The court then stated it would "permit the alternate to remain and deliberate with the jury, and if by chance, one of the jurors becomes ill and cannot stay through the entire deliberation, we will still have a six-member jury left." *Id.* The district court read these comments as consistent with its intent to make the alternate a voting member of the jury, the position embraced by the appellees.

The EEOC, however, contends that the alternate was to participate in deliberations but not to vote. The district court never expressly stated that the alternate would become a part of the jury, but only that she would be permitted to deliberate. The EEOC's argument also finds support in the court's observation that if a juror became ill "we would *still* have a six-member jury." *Id.* (emphasis added). The highlighted language can be read to mean that six persons were to vote on the matter regardless of whether a juror became ill and had to be excused.

**16.** Local rules providing for civil trials by a jury of six are neither violative of the Seventh Amendment nor inconsistent with Federal Rule of Civil Procedure 48. *Colgrove v. Battin,* 413 U.S. 149, 159–60, 163, 93 S.Ct. 2448, 2454, 2456, 37 L.Ed.2d 522 (1973). The Supreme Court left open the question of whether civil trials by fewer than six are constitutional. *Id.* at 159–60, 93 S.Ct. at 2454. A criminal trial by a five-member jury, over the defendant's objection, violates his constitutional right to trial by jury. *Ballew v. Georgia,* 435 U.S. 223, 245, 98 S.Ct. 1029, 1041, 55 L.Ed.2d 234 (1978).

**17.** In upholding six-member juries in civil trials, the Supreme Court found " 'no discernible difference' " in results reached by six-member juries and twelve-member juries. *Colgrove,* 413 U.S. at 159–60, 93 S.Ct. at 2453–54 (quoting *Williams v. Florida,* 399 U.S. 78, 101, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970)). Nevertheless, litigants may believe legitimately that the size of a jury can affect the outcome. *See id.* at 167 n. 1, 93 S.Ct. at 2454 n. 1 (Marshall, J., dissenting); *see also id.* at 159 n. 15, 93 S.Ct. at 2458 n. 15; *Brown v. Louisiana,* 447 U.S. 323, 331–32, 100 S.Ct. 2214, 2221, 65 L.Ed.2d 159 (1980) (noting that prominent concerns in *Ballew,* which found criminal trial by five-member jury constitutionally infirm, were that smaller jury leads to less accurate factfinding and greater risk of convicting innocent person, decreases likelihood of hung jury to detriment of defendant, and reduces odds of adequate minority representation); *Ballew,* 435 U.S. at 232–39, 98 S.Ct. at 1035–38 (cataloguing concerns and reviewing statistical studies). It is important to litigants' views of the fairness of the system that the jury size be determined before the jury retires or the verdict is announced.

Given the importance of a party's decision to agree to a jury of other than a mandated size, we believe that "[i]f there is to be departure from established procedures, misunderstandings by lawyers to the possible disadvantage of their clients can be avoided if the departure is by a written stipulation or one clearly recorded." *Kuykendall v. Southern Ry.,* 652 F.2d 391, 392 (4th Cir.1981) (footnote omitted). This prevents a party from unwittingly agreeing to a jury procedure which it does not desire and avoids *post hoc* rationalizations to sustain or to overturn the validity of a verdict.

**18.** For the text of that colloquy, *see supra,* at 1412.

The discussion of the procedure is open to interpretation. In this context, we have been able to find only one case in which a court has equated "deliberating" with full participation on a jury. *See UNR Indus., Inc. v. Continental Ins. Co.*, 682 F.Supp. 1434, 1446–47 (N.D.Ill.1988). On its face, the word does not have this meaning and we do not believe it to be so universally understood as to remove the ambiguity in the court's suggestion or to bind the EEOC to that definition, especially in light of the local rule.

Accordingly, we hold that the parties did not stipulate to a seven-member jury. There being no effective variance of the standard jury size prescribed by the local rule, the jury consisted of six members, who rendered a unanimous verdict on willfulness.[19]

 Contrary to the views expressed by the parties and the district court, the alternate's presence during the deliberations cannot pose a problem on this record. Any claims of prejudice which the parties might otherwise have been able to assert were waived by their express disavowal of any objections when the court raised the idea of allowing the alternate to remain with the jury. Both sides clearly contemplated the alternate's participation in the deliberations, even though they may have differed on whether she was to vote. By failing to seek clarification of the suggested procedure, they prevented the court from promptly curing any ambiguities in its proposal. They cannot now complain that the jury's composition was other than what they had intended, nor that the alternate's presence resulted in prejudicial error.[20]

## VIII.

For the reasons set forth above, we will reverse the district court's order entering judgment notwithstanding the verdict and conditionally granting a new trial.

---

**19.** Attempting to justify the district court's finding of a seven-person jury, appellees point to evidence of the court's intent and of the clerk's understanding of the procedure, as well as the EEOC's failure to object to the polling of the alternate. The EEOC, arguing that the parties agreed there would be only six voting members, relies on the jurors' belief that the alternate was not to vote, even though the procedure was discussed outside their presence and they were merely instructed that the alternate was to "stay with the jury and join in the jury deliberations." Jt.App. at 611.

These contentions highlight the benefits of requiring that an agreement to vary the jury's size be clearly expressed. Such a standard prevents *post hoc* arguments, which may well be influenced by the desired outcome, as to whether, and on what terms, the parties stipulated to vary the normal jury procedure. In addition, it places the focus on what was actually said, rather than on the secondary sources relied upon by these litigants to bolster their respective positions.

**20.** In light of our conclusions, we must also address the two issues raised in the cross-appeal. First, it challenges the district court's decision to admit the deposition testimony of one PHN based on her unavailability as a witness. Second, it claims error resulted when, in response to an inquiry from the jury, the court instructed the jury to reread the instructions and to submit another note if a question remained. In both cases, the court's action is reviewable only for abuse of discretion. After careful consideration of the parties' arguments, we find no such error.